# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

DEC 31 2019

JEFFREY P. COLWELL
CLERK

Civil Action No. _____

(To be supplied by the court)

JEHRONE D. FALLS
_____, Plaintiff

v.

CITY OF AURORA
_____.

DUSTIN PETERSEN
_____.

ZACHARY PLOCH
_____.

SEE ATTACHED
_____, Defendant(s).

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names of the defendants listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

---

## COMPLAINT

---

| NOTICE |
| --- |
| Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. <br><br> **Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.** |

## A.   PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

JEHRONE FALLS 9995 E. Harvard Ave., #R277 Denver, CO 80231

(Name and complete mailing address)

(720) 403-6550

(Telephone number and e-mail address)

## B.   DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1:   CITY OF AURORA

(Name and complete mailing address)

15150 E. Alameda Pkwy., Aurora CO 80012

(Telephone number and e-mail address if known)

Defendant 2:   OFC. DUSTIN PETERSEN  15151 E. Alameda Pkwy, Aurora, CO 80012

(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 3:   OFC. ZACHARY PLOCH 15151 E. Alameda Pkwy, Aurora CO 80012

(Name and complete mailing address)

(Telephone number and e-mail address if known)

Defendant 4:   OFC. JEREMY McELROY, 15151 E. Alameda Pkwy., Aurora CO 80012

(Name and complete mailing address)

(Telephone number and e-mail address if known)

## C.    JURISDICTION

*Identify the statutory authority that allows the court to consider your claim(s): (check one)*

☑  Federal question pursuant to 28 U.S.C. § 1331 (claims arising under the Constitution, laws, or treaties of the United States)

List the specific federal statute, treaty, and/or provision(s) of the United States Constitution that are at issue in this case.

42 U.S.C.  Fourth & Fourteenth Amendment, 42 U.S.C. Section 1983;

State Law torts-- False arrest/false imprisonment and Negligence

☐  Diversity of citizenship pursuant to 28 U.S.C. § 1332 (a matter between individual or corporate citizens of different states and the amount in controversy exceeds $75,000)

Plaintiff is a citizen of the State of _____.

If Defendant 1 is an individual, Defendant 1 is a citizen of _____.

If Defendant 1 is a corporation,

Defendant 1 is incorporated under the laws of _____ (name of state or foreign nation).

Defendant 1 has its principal place of business in _____ (name of state or foreign nation).

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

**D.     STATEMENT OF CLAIM(S)**

*State clearly and concisely every claim that you are asserting in this action.  For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim.  You do not need to cite specific legal cases to support your claim(s).  If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s).  Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

CLAIM ONE:     42 U.S.C. Fourth Amendment--Unlawful Search & Seizure

Supporting facts:     SEE ATTACHED

CLAIM TWO: <u>42 U.S.C. Section 1983--4th & 14th Amendment- False Arrest</u>

Supporting facts: SEE ATTACHED; (Claim 4-6 Attached also)

**E.    REQUEST FOR RELIEF**

*State the relief you are requesting or what you want the court to do.  If additional space is needed to identify the relief you are requesting, use extra paper to request relief.  Please indicate that additional paper is attached and label the additional pages regarding relief as "E. REQUEST FOR RELIEF."*

**F.    PLAINTIFF'S SIGNATURE**

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct.  *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

(Plaintiff's signature)

12-24-19
(Date)

(Revised December 2017)

6

JEHRONE D. FALLS (Plaintiff)

v.
CITY OF AURORA,
DUSTIN PETERSEN,
ZACHARY PLOCH,
JEREMY MCELROY,
CHRISTOPHER C. ELLIS,
JASON ROSENBLATT,
JONAS A. SPITZER,
Unknown Police Officers (Defendants)

**B.) DEFENDANT'S INFORMATION:**

Defendant 5: OFC. CHRISTOPHER C. ELLIS, 15151 E. Alameda Pkwy., Aurora, CO 80012

Defendant 6: OFC. JASON ROSENBLATT, 15151 E. Alameda Pkwy., Aurora, CO 80012

Defendant 7: OFC. JONAS A. SPITZER, 15151 E. Alameda Pkwy., Aurora, CO 80012

**D. STATEMENT OF CLAIMS (cont).**

**First Claim**: **Fourth Amendment- Unlawful Search and Seizure;**

Supporting Facts:

1. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.
2. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.
3. This claim one is being leveled against Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, in their individual and official capacities, as employees of the City of Aurora, and the Aurora Police Department.
4. This civil action, filed by Jehrone D. Falls, herein the Plaintiff, encompass all unlawful searches and seizures of the Plaintiff, by Defendants, during "Terry" stops, where none of the Defendants, at any time, had probable cause, reasonable suspicion, or any other legal basis to believe that Plaintiff had committed or were committing any crimes prior to the unlawful search

1

and seizure and continued restraint of his person, effectively violating Plaintiff's Fourth Amendment rights to the United States Constitution.

5. In effectuating the unlawfulness of the searches and seizures of Plaintiff's person and vehicles, the named Defendants violated Plaintiff's due process rights under the Fourteenth Amendment of the United States Constitution, where they conducted "Terry" stops (investigative stops), without articulable probable cause, reasonable suspicion, or any other legal basis to believe that Plaintiff had committed or we're committing crimes.

6. Furthermore, Plaintiff's race was a motivating factor in the decision of Defendants to stop, detain and threaten Plaintiff, undertaken with the purpose of depriving Plaintiff of the equal protection and benefits of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment.

7. Defendants had an independent motive to subject the Plaintiff to reprisals, and collectively encouraged, promoted and/or participated in an overall objective to subject the Plaintiff to unlawful searches and seizures.

### a. First Traffic Stop

8. On September 2, 2019, at approximately 11:33pm, the Plaintiff was leaving the parking lot, of a girlfriend's house, located on E. Del Mar Cir. and E. 6th Ave., when he noticed a police vehicle following him, from out of the parking lot, later determined to be Defendants Dustin Petersen and Zachary Ploch.

9. The Defendants were in a dark colored F-150 GMC truck. Defendant Petersen was driving.

10. Upon pulling out the parking lot, Plaintiff made a left turn, traveling westbound on E. Del Mar Cir., heading towards N. Peoria St. 11. As Plaintiff arrived to the traffic signal, at E. Del Mar Cir. and N. Peoria St., to make a right turn, Defendant Petersen activated his emergency lights.

12. Plaintiff immediately pulled over and parked his vehicle on E. Peoria St.

13. As soon as Defendant Petersen parked his truck, four police officers jumped out of the F-150, to include, Defendants Petersen and Ploch, and approached Plaintiff's vehicle on opposite sides.

14. Defendant Petersen requested Plaintiff's identification documents.

15. Plaintiff gave Defendant Petersen his identification documents and asked why he was being detained.

16. Defendant Petersen, told Plaintiff that he failed to obey the signal light.

17. Defendant Petersen went back to the F-150, presumably to check Plaintiff for warrants.

18. Defendant Ploch and the other two (2) unknown police officers stayed positioned around Plaintiff's vehicle.

19. Within minutes, Defendant Petersen approached Plaintiff's vehicle, and demanded him to step out of the vehicle.

20. When Plaintiff protested, because he knows his rights, Defendant Petersen snatched the vehicle door open, put Plaintiff in a twist lock, and pulled him out of the vehicle.

21. Defendants Petersen, Ploch, and the other unknown police officers on scene, began a search of Plaintiff's person and vehicle by force and without his consent.

22. Defendant Petersen told Plaintiff that he had to search Plaintiff's person and vehicle, for drugs and guns, because of Plaintiff's criminal history.

23. After the search of Plaintiff's person and vehicle, didn't produce anything illegal, Defendant Petersen gave Plaintiff a ticket for failure to obey a traffic light, and let him leave, after detaining him long enough to illegally search his person and vehicle.

### b. Second Traffic Stop

24. On September 17, 2019, at approximately 5:12pm, the Plaintiff pulled over to the Aurora Sunmart Convenience store, located at 11889 E. Colfax Ave. #2815, Aurora, CO 80010, to get some gas, when he noticed a police vehicle, parked in the parking lot of the restaurant, next to the gas station, later determined to be Defendants Jeremy McElroy and Christopher C. Ellis.

25. Defendant McElroy was driving.

26. Plaintiff was on his way to purchase a vehicle.

27. After getting gas, Plaintiff pulled out of the parking lot, and drove eastbound on Colfax Avenue.

28. As soon as Plaintiff pulled out of the gas station, heading eastbound on Colfax Avenue, passing the restaurant, Defendant McElroy, pulled out of the restaurant parking lot, and began following Plaintiff.

29. Defendant McElroy, followed Plaintiff approximately three (3) miles, then activated his emergency lights.

30. Plaintiff immediately pulled over and parked his vehicle at E. Colfax Ave. and N. Beeler St.

31. Several unknown police officers arrived within seconds to assist Defendants McElroy and Ellis, with their emergency lights activated.

32. There were four police vehicles on scene. Keep in mind, this was supposed to be a routine traffic stop.

33. The Defendants approached both sides of Plaintiff's vehicle.

34. Defendant McElroy requested Plaintiff's identification documents.

35. Plaintiff gave Defendant McElroy his identification documents and asked why he was being detained.

36. Defendant McElroy, told Plaintiff, that his license plate validation tabs were improperly attached.

37. Defendants McElroy and Ellis went back to their vehicle, presumably to check Petitioner for warrants, while the other unknown police officers stayed positioned around Plaintiff's vehicle.

38. Within minutes, Defendants McElroy and Ellis, came back to Plaintiff's vehicle, opened the vehicle's door, put Plaintiff in a twist lock, and pulled him out of his vehicle, without warning.

39. Defendants McElroy and Ellis began searching Plaintiff's person by force and without his consent.

40. They went through all of Plaintiff's pockets and made him take off his shoes.

41. Nothing illegal was found on his person or possession.

42. The Defendants began demanding that Plaintiff give them consent to search his aunt's vehicle.

43. Defendant McElroy told Plaintiff that he had to search Plaintiff's person and vehicle, for drugs and guns, because of Plaintiff's criminal history.

44. Plaintiff refused to give the Defendants consent to search his aunt's vehicle, because he knows his rights.

45. Upon Plaintiff refusing consent to search his aunt's vehicle, the aforementioned Defendants searched the vehicle anyway.

46. Nothing illegal was found during the unlawful search of the vehicle.

47. After the search of Plaintiff's person and vehicle, didn't produce anything illegal, Defendant McElroy gave Plaintiff a ticket for his license plate validation tabs being improperly attached, and let him leave, after detaining him for close to an hour.

### c. Third Traffic Stop

48. On November 29, 2019, at approximately 10:12pm, the Plaintiff was leaving the parking lot of the Knights Inn Motel, located at 14200 E. 6th Ave., when he noticed a police vehicle following him out of the parking lot, later determined to be Defendants Jason Rosenblatt and Jonas A. Spitzer. Defendant Rosenblatt was driving.

49. Upon pulling out the parking lot, Plaintiff made a left, traveling northbound on N. Billings St., heading towards E. 6th Ave., when Defendant Rosenblatt, activated his emergency lights.

50. Plaintiff immediately pulled over and parked his vehicle in the Conoco Gas Station, located at 14490 E. 6th Ave., Aurora, CO 80011.

51. Several other police units arrived within seconds, with their emergency lights activated.

52. As soon as backup arrived, Defendants Rosenblatt, Spitzer, and the other unknown officers approached Plaintiff's vehicle, on opposite sides.

53. Defendant Rosenblatt requested Plaintiff's identification documents.

54. Plaintiff gave Defendant Rosenblatt his identification documents and asked why he was being detained.

55. Defendant Rosenblatt, told Plaintiff that he left the motel parking lot without his headlights on.

56. Defendant Rosenblatt went back to his vehicle, presumably to check Plaintiff for warrants, while Defendant Spitzer, and the other unknown police officers stayed positioned around Plaintiff's vehicle.

57. Within minutes, Defendant Rosenblatt came back to Plaintiff's vehicle, and demanded Plaintiff to get out the vehicle. 58. Plaintiff protested, because he knows his rights.

59. Defendant Rosenblatt opened the vehicle's door, put Plaintiff in a twist lock, and pulled him out of his vehicle.

60. Defendants Rosenblatt and Spitzer began searching Plaintiff's person by force and without his consent.

61. Defendant Rosenblatt went through all of Plaintiff's pockets.

62. Nothing illegal was found on Plaintiff's person.

63. After the illegal search of his person, the Defendants escorted Plaintiff to the back of the vehicle.

64. Defendant Rosenblatt began demanding Plaintiff to give him consent to search his vehicle.

65. Defendant Rosenblatt, told Plaintiff that he had to search Plaintiff's person and vehicle, for drugs and guns, because of Plaintiff's criminal history.

66. Defendant Rosenblatt, also mentioned the $300.00-$400.00 he seen in the cup holder of the vehicle, inferring that as another reason for the search.

67. Plaintiff refused to give Defendant Rosenblatt consent to search his vehicle, because he knows his rights.

68. Upon Plaintiff refusing consent to search his vehicle, Defendant Rosenblatt and the other officers searched the vehicle anyway.

69. Nothing illegal was found during the unlawful search of the vehicle.

70. After the search of Plaintiff's person and vehicle didn't produce anything illegal, Defendant Rosenblatt gave Plaintiff a false ticket for not using his headlights, and let him leave, after detaining him long enough to illegally search his person and vehicle.

71. As the time of these events, Plaintiff had a clearly established constitutional right, to be free from unlawful searches and seizures, by the Aurora Police Department.

72. Defendants stopped, searched and seized Mr. Falls, as described herein, without reasonable suspicion or probable cause to believe that Mr. Falls had committed, or was committing crimes, or carrying any type of weapons.

73. Defendants intentionally, willfully and wantonly stopped, searched and seized Mr. Falls, as described herein, wholly or due in part to his race.

74. Defendants actions were objectively unreasonable in lieu of the facts and circumstances confronting them.

75. Defendants are also liable for their failure to intervene to prevent the constitutional violations of which they were fully aware and did nothing to prevent.

76. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer humiliation, mental and emotional distress, loss of enjoyment in life, and other significant injuries, damages and losses.

**Second Claim**: **42 U.S.C. §1983--Fourth and Fourteenth Amendment-- False Arrest/False Imprisonment;**

Supporting Facts:

77. Plaintiff hereby incorporates by reference all paragraphs of this complaint as if fully set forth herein.

78. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

79. This claim two is being leveled against Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, in their individual and official capacities, as employees of the City of Aurora and the Aurora Police Department.

80. The actions of the City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, by knowingly, authorizing, directing, and for conducting illegal searches and seizures of Plaintiff's person and vehicles.

81. As a direct and proximate result of Defendants' actions, Plaintiff has suffered and continues to suffer humiliation, mental and emotional distress, loss of enjoyment in life, and other significant injuries, damages and losses.

**Third Claim: 42 U.S.C. §1983--Fourteenth Amendment--Denial of Equal Protection;**

Supporting Facts:

82. Plaintiff hereby incorporate by reference all paragraphs of this complaint as if fully set forth herein.

83. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

84. This claim three is being leveled against Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, in their individual and official capacities, as employees of the City of Aurora, and the Aurora Police Department.

85. On September 2, 2019, at approximately 11:33pm, the Plaintiff was leaving the parking lot, of a girlfriend's house, located on E. Del Mar Cir. and E. 6th Ave., when he noticed a police vehicle following him, from out of the parking lot, later determined to be Defendants Dustin Petersen and Zachary Ploch. Upon pulling out the parking lot, Plaintiff made a left turn, traveling westbound on E. Del Mar Cir., heading towards N. Peoria St. 11. As Plaintiff arrived to the

traffic signal, at E. Del Mar Cir. and N. Peoria St., to make a right turn, Defendant Petersen activated his emergency lights.

Plaintiff immediately pulled over and parked his vehicle on E. Peoria St. As soon as Defendant Petersen parked his truck, four police officers jumped out of the F-150, to include, Defendants Petersen and Ploch, and approached Plaintiff's vehicle on opposite sides.

86. On September 17, 2019, at approximately 5:12pm, the Plaintiff pulled over to the Aurora Sunmart Convenience store, located at 11889 E. Colfax Ave. #2815, Aurora, CO 80010, to get some gas, when he noticed a police vehicle, parked in the parking lot of the restaurant, next to the gas station, later determined to be Defendants Jeremy McElroy and Christopher C. Ellis. After getting gas, Plaintiff pulled out of the parking lot, and drove eastbound on Colfax Avenue. As soon as Plaintiff pulled out of the gas station, heading eastbound on Colfax Avenue, passing the restaurant, Defendant McElroy, pulled out of the restaurant parking lot, and began following Plaintiff. Defendant McElroy, followed Plaintiff approximately three (3) miles, then activated his emergency lights. Plaintiff immediately pulled over and parked his vehicle at E. Colfax Ave. and N. Beeler St. Several unknown police officers arrived within seconds to assist Defendants McElroy and Ellis, with their emergency lights activated. The Defendants approached both sides of Plaintiff's vehicle.

87. On November 29, 2019, at approximately 10:12pm, the Plaintiff was leaving the parking lot of the Knights Inn Motel, located at 14200 E. 6th Ave., when he noticed a police vehicle following him out of the parking lot, later determined to be Defendants Jason Rosenblatt and Jonas A. Spitzer. Defendant Rosenblatt was driving.

Upon pulling out the parking lot, Plaintiff made a left, traveling northbound on N. Billings St., heading towards E. 6th Ave., when Defendant Rosenblatt, activated his emergency lights. Plaintiff immediately pulled over and parked his vehicle in the Conoco Gas Station, located at 14490 E. 6th Ave., Aurora, CO 80011. Several other police units arrived within seconds, with their emergency lights activated. As soon as backup arrived, Defendants Rosenblatt, Spitzer, and the other unknown officers approached Plaintiff's vehicle, on opposite sides.

88. After the incident, Plaintiff filed a complaint with the Aurora Police Department's Internal Affairs Bureau. In response, the bureau stated that the officers had done nothing wrong, or ignored the complaints altogether. These actions are consistent with Aurora's custom of condoning and ratifying unconstitutional behavior by its officers.

89. The City of Aurora, and the Aurora Police Department, has a lengthy and well-documented history of racial profiling, unlawful searches and seizures, excessive force, etc., and because of Aurora's unconstitutional customs, practices and policies, the city of Aurora and is police department has to be transparent with it's data related to traffic stops, and keep records of the race of the people being stopped, rather or not they were searched, etc., called Open Data Policing.

90. Demographically, the City of Aurora is predominantly white.

7

91. Based on the American Community Survey conducted by the census in 2016, only 20,403 African-Americans, out of a population of 399,756, live in the census tract where Plaintiff was stopped.

92. African-Americans only make up 10.2% of the city of Aurora. Comparatively, 113,581 whites live in that same census tract, making up 56.5% of the city of Aurora.

93. Although, African-Americans only make up 10.2% of the City of Aurora's population, blacks are twice as likely to be subjected to traffic stops than whites.

94. African Americans are subjected to traffic stops 20% of the time in the City of Aurora. Comparatively, whites makeup 56.5% of the City of Aurora's population, but only subjected to traffic stops 35% of the time, at a significantly less rate than African-Americans.

95. Even more compelling, is African-Americans persons and vehicles are searched at a significantly higher rate than whites during routine traffic stops.

96. For example, although African-Americans make up 10.2% of the City of Aurora's population, their persons and vehicles are searched 26% of the time, in comparison to whites who make up 56.5% of the population, who's persons and vehicles are searched 16% of the time.

97. Plaintiff assert that, the reason for the "Terry" stops at issue, was "driving while black." Defendants visually seen Plaintiff each time prior to the traffic stops.

98. The three (3) incidents involving Plaintiff, standing alone, is sufficient evidence of these customs, policies and/or practices. Yet, there is more evidence of Aurora's unconstitutional customs, policies, and/or practices, regarding Fourth Amendment violations.

99. On 01/19/19, after leaving the Kings Motor Inn, located at 11800 E. Colfax Ave., while traveling westbound on Colfax Ave., Teddy T. Pittman noticed he was being followed by an Aurora Police Officer, later determined to be Officer Darian Dasko. Officer Dasko followed Mr. Pittman for approximately 3 miles through the City of Aurora, then activated his emergency lights just as Mr. Pittman was crossing into Denver from Aurora. Mr. Pittman immediately stopped his vehicle at E. Colfax Ave. and N. Xanthia St. Mr. Pittman was scared because he had done nothing wrong, and didn't know why he was being stopped.

Officer Dasko approached the driver side of the vehicle and contacted Mr. Pittman and told Mr. Pittman that he was being stopped for a defective driver side headlamp and requested his identification documents. Mr. Pittman knew that the reason for the stop wasn't right, because there wasn't anything wrong with the headlamps on his vehicle. While sitting there waiting for Officer Dasko to return his identification documents, 8-10 police officers arrive onto the scene as backup, including Officers Palacio and Veith. Officer Dasko returned to Mr. Pittman's vehicle and demanded him to step out of the vehicle, so he could search Mr. Pittman's person and vehicle for weapons and drugs. Officer Dasko did not have reasonable suspicion to believe that Mr. Pittman had committed any crimes. When Mr. Pittman protested, Officers Dasko and Veith, put Mr. Pittman in a twist lock, pulled him out of his vehicle, and searched Mr. Pittman's person and vehicle by force, without his consent. See *Pittman v. Palacio, #2019-cv-01947.*

100. On April   On 04/03/2019 after returning to the Keys Motor Inn, located at 11 800 East Colfax Avenue, while pulling into the parking lot, Mr. Teddy T. Pittman, was stop by Aurora police Officer Delbert L Tisdale Jr. And several other Aurora police officers. These officers came out of nowhere, activated their emergency lights, and swarm Mr. Pittman's vehicle, as he pulled into the parking lot of the motel. Mr. Pittman immediately stopped his vehicle. He was scared. He hadn't done nothing wrong. Officer Tisdale, approached the driver's side approached the driver side, and requested Mr. Pittman's identification documents. Mr. Pittman, handed Officer Tisdale identification documents. Officer Tisdale did not explain to Mr. Pittman, why he stopped him. Officer Tisdale return to his vehicle presumably to run a warrant check on Mr. Pittman. While waiting for Officer Tisdale to return his identification documents, Mr. Pittman noticed several unknown police officers arrive on the scene as backup. When Officer Tisdale returned to Mr. Pittman's vehicle, he demanded his to step out of his vehicle, whereas he could search Mr. Pittman's person and vehicle for drugs and weapons. Mr. Pittman exercised my rights and refused to consent to the search of his person and vehicle, and explained to Officer Tisdale, that he did not have the authority or the right to search his person or vehicle, and refused to get out of his car. Immediately after he refused to give consent to search of his person and vehicle, Officers Tisdale, Zimmerman, McElroy, and Spano, put him in a Twist lock, and forced him out of his vehicle, then unlawfully searched Mr. Pittman's person and vehicle, by force, and without his consent. *Pittman v. City of Aurora, 19-cv-02209.*

101. On November 21, 2018, Jamie Alberto Torres (Mr. Torres) was fixing a car in his garage with friends when a neighbor complained about noises coming from the garage. Two Aurora law enforcement officials, Defendants Ethan Yazdani and Reginald DePass, came to Mr. Torres' home solely to investigate this noise complaint. During the course of the investigation, these Aurora officers brutalized Mr. Torres, who behaved peacefully and respectfully during the entire encounter. Defendant Yazdani illegally ordered Mr. Torres to exit his own garage, threatening to take Mr. Torres to jail. Because Mr. Torres paused momentarily before complying with Defendant Yazdani's illegal order, Defendant Yazdani grabbed Mr. Torres, wrenched his arm behind his back, picked him up, and slammed him to the ground. Even after handcuffing Mr. Torres, Defendant Yazdani continued to attack Mr. Torres by slamming him to the ground again and wrenching his arm behind his back multiple times. During this encounter, Mr. Torres repeatedly screamed in pain. Aurora officers immediately began the cover-up. While Mr. Torres was being assaulted by Defendants Yazdani and DePass, his wife, Maria Ibarra, attempted to film the violence. Another Aurora police officer, Kristi Mason, prevented Ms. Ibarra from recording the
encounter so as to avoid memorializing her fellow officers' unconstitutional actions. To justify their illegal conduct, the Defendant officers charged Mr. Torres with resisting arrest and failure to obey a lawful order. A jury acquitted Mr. Torres of these charges at trial. The Aurora Police Department investigated its officers' use of force against Mr. Torres and found no wrongdoing. See *Torres v. City of Aurora, #18-cv-02986.*

102. On July 13, 2017, one Aurora officer choked-slammed an African-American woman, Vanessa Peoples, while police were performing a welfare check in her home. Several other Aurora officers then piled on Ms. Peoples. What "provoked" the officers' attack was Ms. Peoples' protestations of the officers' misconduct and her failure to be 100% compliant with every single police directive (legal or illegal). Eventually, the officers hog-tied Ms. Peoples so tightly that they dislocated her shoulder. Despite Ms. Peoples' continued cries of pain, Aurora officers kept her hog-tied for 30 minutes with her shoulder dislocated. The Aurora officers had no reason to believe Ms. Peoples had committed a crime; yet they charged her with obstruction. Those charges were later dismissed. Ms. Peoples settled her claims for $100,000 pre-litigation. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions.

103. On April 22, 2017, multiple Aurora police officers tased and assaulted Brandon Washington, an African-American man. The officers had responded to an automobile accident in which Mr. Washington was involved. Upon arriving on scene, the officers used grossly excessive force because Mr. Washington, while still clearly in shock and disoriented from the accident, questioned their commands that he exited his vehicle. In response to this perceived non-immediate compliance, Aurora officers almost immediately dragged Mr. Washington out of his vehicle. One officer tased Mr. Williams multiple times while other officers physically assaulted him. During the assault, Mr. Washington (who has asthma), kept yelling, "I can't breathe." To justify their use of force against a survivor of a recent automobile accident, Aurora officers charged Mr. Washington with a number of crimes, including resisting arrest. Those charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers. See *Washington v. City of Aurora #19-cv-01160.*

104. On March 16, 2016, multiple Aurora police officers racially profiled Omar Hassan, an African American man, and ejected him from a coffee shop simply because he was an African-American man wearing a hoodie. The Aurora officers acted solely on the basis of Mr. Hassan's appearance; they had no reasonable grounds for suspecting that he was engaged in any criminal conduct. Aurora officers told Mr. Hassan that he had to leave the coffee shop, because Mr. Hassan's "kind of business [was] not welcome [t]here." When he questioned the directive, one officer placed her hand on her gun, non-verbally threatening Mr. Hassan with use of deadly force. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid Mr. Hassan to settle his legal claims. *See Hassan v. Williby, et al., #17-cv-02335.*

105. On February 19, 2016, Auroras officers stopped and detained Darsean Kelley simply because he was an African-American man who happened to be in the vicinity of a reported crime. He questioned the officers' orders and demanded to know whether or not he was being detained. Mr. Kelley complied with officers' orders but also asserted "I know my rights" just as one officer tased him in the back. The Aurora officers conducting the stop had no reason to believe that Mr. Kelley had committed a crime or was armed or dangerous. To cover up the

illegal stop and the unjustified tasing, Aurora charged Mr. Kelley with failure to follow a lawful order. That charge was eventually dismissed, but Aurora found no misconduct chose not to discipline any of the officers involved in this unconstitutional detention and use of excessive force. Aurora paid Mr. Kelley $110,000 to settle his legal claims pre-litigation.

106. On December 22, 2015, several Aurora officers assaulted OyZhana Williams, an African-American woman, who was simply visiting her boyfriend in the hospital. When Ms. Williams refused the officer's illegal order that she give him the keys to her car, the officer tackled Ms. Williams, choked her, slammed her head against the ground and then stomped on her head. Aurora officers had no probable cause or reasonable suspicion to believe Ms. Williams had committed any crime. Yet, to cover up their excessive use of force, the officers charged Ms. Williams with a crime and arrested her. The charges were dismissed. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid over $350,000 to settle Ms. Williams' claims. See *Williams v. Hawkins, et al., #17-cv-02123.*

107. On November 14, 2015, two Aurora officers ordered Dwight Crews, a 60-year-old, disabled African-American man, out of his home under threat of force, despite the fact that the officers had no warrant and no exceptions to the warrant requirement justified a warrantless arrest in the home. After Mr. Crews complied with the two Aurora officers' illegal commands to exit his home in the middle of the night, the officers forcefully threw him to the ground. The officers assaulted Mr. Crews only because he had momentarily delayed complying with their illegal commands in order to try and prevent his cat from getting out of his house. To cover up their unconstitutional conduct, the Aurora officers charged Mr. Crews with resisting arrest. The judge dismissed the charge halfway through Mr. Crews' trial. Upon information and belief, Aurora did not discipline the involved officers for their unconstitutional treatment of Mr. Crews. Aurora paid Mr. Crews to settle his legal claims. See *Crews v. Gerdjikian, et al., #17-cv-02694.*

108. On March 6, 2015, an Aurora police officer shot and killed Naeschylus Vinzant-Carter, an unarmed African-American man. Mr. Vinzant-Carter was being pursued by Aurora's SWAT team, near an elementary school, when he was confronted. One officer then opened fire, killing Mr. Vinzant-Carter. Aurora paid $2,600,000 to settle Mr. Vinzant-Carter's claims. Upon information and belief, Aurora did not discipline any of the involved officers for this use of excessive force. See *Naeschylus Carter-Vinzant v. City of Aurora, et al.*

109. On July 23, 2011, an Aurora police officer conducting an impromptu police undercover investigation shot and killed Juan Contreras, a Hispanic man. Mr. Contreras had found a set of lost car keys and was attempting to return them to the owner when he was wrongfully suspected of committing a minor crime, and Aurora police shot and killed him. Aurora paid $400,000 to settle Mr. Contreras' claims.

110. On December 18, 2010, Aurora police officers used excessive force in their brutal

treatment of Rickey Burrell, an African-American man lying helpless in his bed after suffering a seizure. The officers had responded to a 911 call from Mr. Burrell's family. Rather than render assistance, Aurora officers inexplicably jumped on Mr. Burrell, wrenched his arm behind his back, and handcuffed him. The officers proceeded to roughly drag Mr. Burrell outside, though he was clad only in underwear that he had soiled during his seizure. Mr. Burrell suffered a wrist fracture and other injuries to his back and shoulder as a result of the officers' actions. Aurora paid $100,000 to settle Mr. Burrell's claims. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. See *Burrell v. City of Aurora, Colorado et al, #11-cv-02766.*

111. On February 12, 2009, Aurora police officers used excessive force in effecting the arrest of Carla Meza, a Hispanic woman. Aurora officers responded to a domestic violence report after Ms. Meza was accused of assaulting her girlfriend. Officers handcuffed Ms. Meza and proceeded to make homophobic remarks towards her before one of the officers kicked her in the head while she was handcuffed, breaking her eye socket. The officer kicked her in the head because she refused to comply with his unlawful commands. The officer was found to have used excessive force by an internal investigation. See *Meza v. City of Aurora, Colorado et al, #10-cv-00330.*

112. On March 23, 2008, multiple Aurora police officers unlawfully entered the home of, and tased, Duane Williams, an African-American man. The officers had been called to Mr. Williams' home for a disturbance. Upon arrival, they unlawfully entered Mr. Williams' home without permission and ordered him to the ground. When Mr. Williams questioned why the officers were in his garage, they tased him. Aurora police tased Mr. Williams multiple times, hit him with batons, and placed him in a choke hold. Mr. Williams suffered a compound fracture to his leg that required the insertion of a permanent metal rod and screws. Mr. Williams' claims against Aurora were settled in 2010.

113. In June 2006, an Aurora police officer choked, slapped, and slammed to the ground twelve-year-old Cassidy Tate, an African-American girl. The officer had accused the girl's mother of illegally parking in a handicapped spot, despite the fact that Ms.Tate's mother had a handicap placard and used portable oxygen. In contacting Ms. Tate and her mother, the Aurora officer stated, "can you believe these fucking N's," which was a reference to the word "nigger." Ms. Tate's claims settled for $175,000. Instead of disciplining the racist and brutal officer, Aurora later promoted him. Later, in June 2017, the same officer who brutalized Ms.Tate was caught on body camera footage referring to African-Americans as "Alabama Porch Monkeys." The officer was terminated by the Aurora Police Department, but then the City of Aurora purposefully reinstated him.

114. In December 2003, Aurora officers shot and killed Jamaal Bonner, an African-American man, during a prostitution sting. When an Aurora SWAT team burst into his hotel room, Mr. Bonner, who was unarmed, stood up in surprise. Aurora officers tased him, causing him to go the ground face down. Though Mr. Bonner had already been effectively tased, was surrounded by Aurora police officers, and was not armed, an Aurora officer shot Mr. Bonner

three times, killing him. Upon information and belief, Aurora did not discipline any of the involved officers for their unconstitutional actions. Aurora paid $610,000 to settle the family's legal claims.

115. Through Aurora's continuous ratification of racially biased policing and illegal searches and seizures against people of color, Aurora has condoned the conduct of Defendant officers.

116. Defendant Aurora failed to properly train and supervise its officers to avoid the use of racially-biased policing, and unlawful seizures.

117. Defendant Aurora knew or had constructive knowledge, based on the customary, racially biased actions of its officers and Defendant Aurora's condoning of those actions, that its officers would be influenced by racial bias when deciding to stop people of color like Plaintiff although no legal basis exists to conduct these unlawful stops.

118. Defendant Aurora could have and should have pursued reasonable methods for the training and supervising of the Defendant officers, but failed to do so.

119. Defendant Aurora's policies, customs, or practices in failing to properly train and supervise its employees were a moving force and proximate cause of their violation of Plaintiff's constitutional rights.

**Fourth Claim**: **State Tort-False Arrest/False Imprisonment;**

Supporting Facts:

120. Plaintiff hereby incorporates by reference all paragraphs of this complaint as if fully set forth herein.

121. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

122. This claim four is being leveled against Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, in their individual and official capacities, as employees of the City of Aurora, and the Aurora Police Department.

123. Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, subjected the Plaintiff to an arrest without probable cause.

**Fifth Claim**: **State Tort-Negligence;**

Supporting Facts:

124. Plaintiff hereby incorporates by reference all paragraphs of this complaint as if fully set forth herein.

125. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

126. This claim five is being leveled against Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, in their individual and official capacities, as employees of the City of Aurora and the Aurora Police Department.

127. The actions of Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, by knowingly authorizing, directing, and/or conducting illegal searches and seizures of the Plaintiff's person and vehicles, in violation of the Aurora Police Department's policies and procedures, as well as state and municipal ordinances, laws, and statutes, amount to negligence.

128. The failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation falls below the legal standard established to protect others against unreasonable risk of harm is negligent.

129. Defendants have a legally imposed duty or a standard of conduct under the City of Aurora and the Aurora Police Department's Directives Manual, that they failed to adhere to.

130. Defendants disregarded Plaintiff's rights and fundamental protections under State and Federal Law.

131. Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, follow an absolute custom, practice and policy of subjecting African-American males to unlawful searches and seizures, and racial profiling, in violation of the City of Aurora, and the Aurora Police Department's Directives Manual, is tantamount to negligence.

132. Defendants, as described above, were acting recklessly, knowingly, intentionally, willfully and wantonly, caused Plaintiffs injuries.

**Sixth Claim**: **State Tort-Intentional Infliction of Emotional Distress;**

Supporting Facts:

133. Plaintiff hereby incorporates by reference all paragraphs of this complaint as if fully set forth herein.

134. Defendants were acting under color of state law in their actions and inactions which occurred at all relevant times to this action.

135. This claim six is being leveled against Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, and several unknown police officers, in their individual and official capacities, as employees of the City of Aurora and the Aurora Police Department.

136. The actions of Defendants City of Aurora, Dustin Petersen, Zachary Ploch, Jeremy McElroy, Christopher C. Ellis, Jason Rosenblatt, Jonas A. Spitzer, by knowingly authorizing, directing, and/or conducting illegal searches and seizures of the Plaintiff's person and vehicles, in violation of the Aurora Police Department's policies and procedures, amount to intentional infliction of emotional distress.

**E.) REQUEST FOR RELIEF**

Plaintiff requests the following relief:

A.) Appropriate declaratory and other injunctive and/or equitable relief as to each Defendant in their individual capacities;

B.) Compensatory and general damages on all claims allowed by law, in an amount to be determined at trial from all defendants named in their individual and official-capacities;

C.) Punitive damages and exemplary damages on all claims allowed by law in an amount to be determined at trial from all defendants named in their individual and official capacities;

D.) A trial by jury;

E.) Pre-and-Post judgment interest at the lawful rate;